UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SHANNON GRAHAM,                    )
                                   )
          Plaintiff,               )
                                   )
vs.                                )     Case No. 4:05CV365 CDP
                                   )
ORTHO-MCNEIL                       )
PHARMACEUTICAL, INC. et al.,       )
                                   )
          Defendants.              )

## MEMORANDUM AND ORDER

Plaintiff Shannon Graham, an African-American, claims that she was fired

from her job as a pharmaceutical sales representative at Ortho-McNeil

Pharmaceutical, Inc. because of her race and in retaliation for a complaint she made

about discriminatory treatment.  She seeks relief under 42 U.S.C. § 1981 and Title

VII.  Defendant Johnson & Johnson and its wholly owned subsidiary, defendant

Ortho-McNeil Pharmaceutical, Inc. (collectively "OMP"), claim that they fired

Graham because she falsified company records and lied about her activities.

OMP has moved for summary judgment on all of Graham's claims.  I heard

argument on the motion on June 14, 2006.  OMP offered several legitimate, non-

discriminatory reasons as to why Graham was fired, which Graham has failed to

rebut.  Graham has not offered evidence that could lead to any inference that OMP's

Dockets.Justia.com

reasons are pretextual or otherwise unworthy of credence. There is no evidence suggesting discrimination based on race. Graham's retaliation claim also fails because she has not produced any evidence linking her termination to a protected activity or even any evidence demonstrating that the OMP decision-makers were aware of her complaint. Because there are no genuine issues of material fact and the undisputed evidence shows no racial or retaliatory motive, I will grant OMP's motion for summary judgment on Graham's claims.

I.    **Factual Background**

In April of 2001, Shannon Graham was hired as a sales representative for Ortho-McNeil Pharmaceutical, Inc., a company that develops, manufactures, and sells pharmaceuticals. Graham was one of the four sales representatives that constituted the "Pod" assigned to the Cape Girardeau, Missouri territory. Her Pod partner was Jim Outman.

Graham's job responsibilities included meeting with the physicians in her sales territory, developing a rapport with physicians and their staff, educating the physicians and staff on OMP products, and convincing physicians to prescribe OMP products. After each visit or "call" to a physician's office, OMP sales representatives are required to enter information about the call into OMP's computer system, including the specific message delivered to the physician, the

physician's response to the message, the name and quantity of each prescription drug sample left at the physician's office, and the objective of the next call to that physician. A sales representative's call activity can be viewed in the computer system by her district manager ("DM") or by other members of her Pod.

OMP sales representatives are also required to fill out F151 forms, which detail the quantity of prescription drug samples left for a physician on a specific date. One copy of each F151 is left with the physician, a second is kept by the sales representative, and a third is sent to OMP's home office. OMP's Samples Management Policy requires that F151 forms be filled out completely and accurately.

OMP sales representatives are provided with a company car and a credit card for purchasing fuel for the car. OMP company policy requires that all personal miles driven on the company car be reported on expense reports submitted by the sales representatives.

When Graham was hired, her supervisor or DM was Monica Browka. Before Browka left her position in 2002, she recommended Graham for promotion to a hospital representative position. Graham and her Pod partner, Jim Outman, were the number one ranked sales representatives for 2002 and part of 2003.

In August of 2002, Dawn Berkel became the supervisor or DM of ten OMP

sales representatives, including Graham and Jim Outman. According to Graham, Berkel disliked her from the beginning. They met for the first time at a company meeting in September 2002. Graham says Berkel accused her of being rude and unprofessional for not coming up and introducing herself before the meeting began. Berkel admits that she thought it was unprofessional for Graham to not introduce herself. Graham also claims that Berkel cut short work sessions with her on multiple occasions. In a meeting on October 17, 2002, Berkel put Graham on "Final Warning" as a result of four customer complaints filed between April and October 2002 regarding Berkel's behavior. However, OMP did receive two letters from customers complimenting Graham. One was sent in April 2003 and the other is undated.

Graham alleges that in November 2002 she called an OMP human resources representative, Carmen Harris, to complain about discriminatory treatment by Berkel. Harris does not recall such a conversation with Graham but she admits that she was copied on emails between Graham and Berkel concerning Graham's final warning. The OMP decision-makers in Graham's termination, Berkel and Waselefsky, both state by affidavit that they were unaware of any complaints made by Graham to Harris. OMP company files contain no record of any complaint by Graham.

-4-

Berkel began an investigation into Graham's conduct on March 14, 2003, when Graham's Pod members called to complain about her. They said that Graham was rarely available for Friday Pod meetings and that her physician call activity for that day had already been submitted into the computer system before the work day had even begun. Berkel claims that she checked the system around 9:00 a.m. and found Graham had already entered information that could not be known until after the physician calls had been made, such as the physicians' responses and quantity of drug samples left. When Berkel checked the computer system again at the end of the work day, none of the call information had changed. Berkel contacted her sales district's human resources representative, Dave Waselefsky, who told her to monitor Graham's call activity in the computer system to see if it happened again. Berkel checked again and found the same pattern of early reporting on Monday, March 17, 2003.

The suspicious call reporting prompted Berkel to review other records completed by Graham, including fuel expense reports, physician office sign-in sheets, and F151 sample drop forms. Berkel found that Graham had purchased fuel on the company credit card numerous times at locations outside of her sales territory, yet Graham reported no personal miles on the company car. A few of these non-territorial fuel purchases were made near the residence of Graham's

boyfriend in Centralia, Illinois.

Berkel also discovered inconsistencies between the sign-in sheets for pharmaceutical representatives at certain physician's offices and Graham's call activity reported in the OMP computer system. For example, according to the sign-in sheets at one doctor's office and two nurse practitioners' offices, Berkel visited them on Tuesday, February 25, 2003, and left drug samples on that date. However, according to the OMP computer system, Berkel called on those customers on Friday, February 28, 2003, and left the same quantity of drug samples as she had reported on the physician sign-in sheets for Tuesday, February 25, 2003. In an attempt to determine if the visits actually occurred on the Tuesday or Friday, Berkel retrieved copies of the F151 sample drop forms left by Graham with the customers after those visits. The forms were dated "February 2003." The exact day of the visit had been left blank. Then Berkel reviewed copies of F151 forms left with five other physicians who Graham called on, and found the day blank on all of them. However, the copies of the same F151 forms that went to the OMP home office all contained a specific date.

Around the beginning of April 2003, Berkel and Jim Graham, another district manager (with no relation to plaintiff), met with Graham to give her an opportunity to explain the multiple incidents of falsified records that Berkel had uncovered.

-6-

Graham denies that Berkel's notes of Graham's verbatim responses are accurate. But nowhere in the record does Graham say what her responses actually were at that meeting. She does admit that she had no good explanations for Berkel at the confrontation meeting, but explains now that was because her Palm Pilot with her personal calendar had been stolen weeks before.

Berkel testified that at the meeting Graham said that she only logged calls into the computer system after actually calling on the physicians, and that she never put a call in the system beforehand. Graham testified at her deposition, however, that it is possible to pre-plan calls so that some of the information is in the computer system before the calls are made. However, she did not recall at the deposition if she had pre-planned the calls for March 14th and 17th, 2003. Now, in an affidavit filed after her deposition, Graham denies submitting any calls into the system before they were made.

In response to questioning about inconsistencies in personal miles and fuel location charges, Berkel recalls Graham stating at the meeting that she had no explanation and that she never reported any personal miles because she had a personal car. Graham testified at her deposition that she did not recall ever using her company car for personal reasons. In the more recent affidavit, however, Graham admitted to not recording on expense reports the personal miles she logged

on the company car on two different occasions.

Finally, in response to questioning about inconsistencies between F151 dates and computer system dates for when certain calls were made to specific doctors, Berkel recalls Graham stating at the meeting that she had always left the day blank and then filled it in later when she entered the information into the computer system. Graham explained at her deposition that she would visit the doctors on both the date on the F151 form and then again on the date in the computer system because she had run out of drug samples at the first visit and had to return a few days later with more.  However, in her affidavit Graham states that she left the day blank in F151 forms because it allowed her to know which forms she had logged into the computer system and which ones she had not.  Graham claims in her affidavit that Berkel was aware of and had approved of her method of completing the F151 forms.  Graham also now says that her Pod partners told her that if she had to visit a physician twice in one week because she ran out of samples the first time, she should date the sign-in sheet as of the first visit date and date the computer system entry as of the final visit date.

Based on Berkel's investigation and Graham's responses at the meeting, Berkel and Waselefsky concluded that Graham had submitted false call activity into the computer system, submitted false F151 forms, and submitted false reports

regarding use of the company car. As a result, they decided to terminate Graham's employment with OMP. Graham was terminated at a meeting on April 29, 2003.

## II.  **Discussion**

The standards for summary judgment are well settled. In determining whether summary judgment should issue, the Court views the facts and inferences from the facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in its pleadings but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). At the summary judgment stage, I will not weigh the evidence and decide the truth of the matter, but rather I need only determine if there is a genuine issue for trial. Anderson, 477 U.S. at 249. Finally, in making this determination, I must be mindful of the Eighth Circuit's admonition that "summary judgment should seldom be granted in discrimination cases." Bassett v. City of Minneapolis, 211 F.3d 1097, 1099 (8th Cir. 2000). Under these standards, I review

-9-

the facts of this case.

### 1.    Race Discrimination Claim

Because there is no direct evidence of discriminatory intent, I will analyze

Graham's disparate treatment claim under Title VII using the analytical framework

of burden shifting developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1973), and later refined in Texas Department of Community Affairs v. Burdine,

450 U.S. 248 (1981), and St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).

This framework guides my analysis of Graham's §1981 claim as well.  See Barge v.

Anheuser-Busch, Inc., 87 F.3d 256 (8th Cir. 1996).

Under this framework, Graham must first establish a prima facie case of

discrimination by adducing proof that: (1) she is a member of a protected class; (2)

she was qualified for the job for which she was hired; (3) she suffered an adverse

employment action; and (4) the circumstances surrounding the adverse employment

action create an inference of unlawful discrimination.  Burdine, 450 U.S. at 253 n.6.;

see also Lidge-Myrtil v. Deere & Co., 49 F.3d 1308, 1310 (8th Cir. 1995).  The

prima facie case creates a rebuttable presumption of discrimination.  Burdine, 450

U.S. at 254.

Once Graham creates this rebuttable presumption, OMP must advance a

legitimate, non-discriminatory reason for the termination.  St. Mary's Honor Center,

509 U.S. at 506-08.  OMP's burden is one of production, not proof.  <u>Burdine</u>, 450

U.S. at 254-55; <u>Krenik v. County of Le Sueur</u>, 47 F.3d 953, 958 (8th Cir. 1995).

OMP need not persuade the court; rather, it must simply provide some evidence of a

non-discriminatory reason or reasons for its action.  <u>St. Mary's Honor Center</u>, 509

U.S. at 509.

    If the defendant carries this burden, then the burden shifts back to the plaintiff

to show that the employer's proffered reason is merely a pretext for discrimination.

<u>Burdine</u>, 450 U.S. at 253.  The plaintiff may either prove pretext directly, by

showing that her employer was more likely motivated by a discriminatory reason, or

indirectly, by showing that her employer's explanation is unworthy of credence.

<u>Rose-Maston v. NME Hospitals, Inc.</u>, 133 F.3d 1104, 1108 (8th Cir. 1998).  The

plaintiff at all times bears the ultimate burden of establishing the existence of facts

which, if proven at trial, would permit a jury to conclude that intentional

discrimination was the true reason for the defendant's action.  <u>Id.</u> at 508.

    OMP claims that it is entitled to summary judgment because Graham cannot

prove that its reasons for firing her were pretextual.  Although I find nothing in the

record that would create an inference of unlawful discrimination (other than the fact

that Graham is black, which is a separate element of the prima facie case), I will

nevertheless assume for purposes of this motion that Graham has established a

prima facie case and so will analyze the pretext issues.  OMP states that Graham

was terminated for falsification of company records and offers the following specific

reasons for the termination: (1) Graham reported calls in the computer system before

actually visiting the physician and submitted calls in the system on a date other than

when the visit occurred; (2) Graham left F151 forms undated in an effort to conceal

that she did not submit calls in the system on the date the visit occurred; and (3)

Graham did not report personal miles on the company car and fuel expenses

associated with those miles.  On their faces those are legitimate non-discriminatory

reasons for the termination.

Since OMP has met its burden to produce a legitimate, non-discriminatory

reason for terminating Graham, the burden shifts to Graham to "'prove by a

preponderance of the evidence that the legitimate reasons offered by the defendant

were not its true reasons, but were a pretext for discrimination.'" Reeves v.

Sanderson Plumbing Prod., Inc., 530 U.S. 133, 143 (2000) (quoting Burdine, 450

U.S. at 253).  Graham can withstand summary judgment if the evidence in its

entirety: (1) creates a fact issue as to whether OMP's proffered reasons are

pretextual; and (2) creates a reasonable inference that race was a determinative

factor in the adverse employment decision.  Rothmeier v. Investment Advisors, Inc.,

85 F.3d 1328, 1336-37 (8th Cir. 1996).  Viewing the facts and inferences from the

facts in the light most favorable to Graham, I find no evidence that creates a reasonable inference that race was a determinative factor in Graham's termination from OMP, nor do I find any evidence that could support an inference of pretext.

Graham argues that summary judgment is inappropriate in this case based on the Supreme Court's decision in Reeves.[1]  530 U.S. 133 (2000).  In Reeves the Court found that the evidentiary burden borne by plaintiffs who attempt to prove intentional discrimination had been misconceived by the Court of Appeals.  Id. at 146.  A plaintiff must not always introduce additional, independent evidence of discrimination because the evidence establishing the prima facie case and rejecting the employer's explanation may suffice.  Id. at 149.

---

[1]  Graham also relies on Reeves for the argument that any testimony  for the defendants by interested witnesses cannot be considered on a motion for summary judgment: "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" 530 U.S. at 151 (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529 at 300 (2d ed. 1995)).  The Court knows of no Eighth Circuit authority on this issue in the context of summary judgment, but agrees with the Seventh Circuit's conclusion that Reeves should not be interpreted "so broadly as to require a court to ignore the uncontroverted testimony of company employees or to conclude, where a proffered reason is established through such testimony, that it is necessarily pretextual.  To so hold would essentially prevent any employer from prevailing at the summary judgment stage because an employer will almost always have to rely on the testimony of one of its agents to explain why the agent took the disputed action." Traylor v. Brown, 295 F.3d 783, 791 (7th Cir. 2002).

Graham relies on the Supreme Court's statement in <u>Reeves</u> that "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." <u>Id.</u> at 147. Graham argues that OMP's conclusion that she misrepresented her call reporting and fuel reporting is false, and therefore must be pretextual. In her response to defendants' statement of uncontroverted material facts, Graham "admits that in between a work-related self-development day to St. Louis on March 16, 2003, she had approximately 100 miles that should have been reported as personal miles, and she had a trip to Centralia, IL on January 26, 2003, that should have been reported as personal miles." As the Eighth Circuit said with regard to the application of <u>Reeves</u> in a similar situation, "*Reeves* only helps [plaintiff] if she has produced sufficient evidence to reject the legitimate explanation." <u>Taylor v. QHG of Springdale, Inc.</u>, 218 F.3d 898, 900-01 (8th Cir. 2000). Graham admits that at least part of the reason was not false, so there can be no inference of discrimination based on falsity.

OMP argues that it makes no difference whether Graham can prove that she is innocent of the misconduct OMP used to justify her termination. In determining pretext, the Eighth Circuit has stated that the issue is not whether the employer's suspicions of employee wrongdoing were correct, but instead is whether the employer "conducted a thorough investigation and whether it made credibility

-14-

determinations reasonably and in good faith." <u>Rodgers v. U.S. Bank, N.A.</u>, 417 F.3d 845, 855 (8th Cir. 2005). <u>See</u> <u>also</u> <u>Wheeler v. Aventis Pharmaceuticals</u>, 360 F.3d 853, 859 (8th Cir. 2004) (explaining that the inquiry is not whether the employer's decision was correct or wise but only whether it was the real reason for the termination). Graham argues that this is not the correct standard, but it is the law of this Circuit. I also believe it is a correct interpretation of the statute and of Supreme Court precedent. Moreover, although Graham disputes Berkel's recollection of her explanations given at the initial confrontation meeting, she provides no contrary account of how she explained her actions at that time. She admits that she did not provide the explanations she has now provided at the meeting. It is undisputed that Graham provided no satisfactory explanation to the decision-makers before they made their decision. Given the undisputed evidence, I agree with OMP that there is no evidence before the Court which demonstrates an unreasonable or bad faith decision by OMP to terminate Graham.

Despite Graham's attempt to raise a factual issue as to pretext, she offers no evidence which creates a reasonable inference that race was a determinative factor in her termination. There is nothing that suggests that Berkel and Waselefsky were guided by any motive other than Graham's misconduct when they decided to terminate her employment. Although all discrimination plaintiffs surely believe that

-15-

discrimination was the motive, a plaintiff's belief is not sufficient to withstand

summary judgment.  Graham fails to identify a single action or comment by either of

the two decision-makers from which a jury could conclude that their decision was

based on Graham's race.  Graham states that she complained to Carmen Harris

about unspecified discriminatory treatment from Dawn Berkel.  However, Graham

provides no examples of any comments, suggestions, or innuendoes that could

create an inference that Berkel was treating her differently because of her race.  The

most Graham can say is that she believed Berkel disliked her.  Dislike is not the

same as discrimination.

Graham argues that mistreatment from Berkel, combined with examples of

other Pod members being treated differently, leads to the inference that "Berkel

didn't like the fact that a black woman would act that way and [therefore Berkel]

treated her differently from that point forward."  Her examples of mistreatment and

disparate treatment do not show anything from which a discriminatory motive may

be inferred, however.  Graham claims that Berkel treated her differently because she

was offended that Graham did not introduce herself to Berkel at their first district

meeting together.  She also claims that Berkel spent less time coaching her because

she ended work sessions early with Graham but not with white Pod members.

Accepting these allegations as true for the purpose of deciding this motion, neither a

reprimand based on unprofessionalism nor the act of cutting sessions short creates

an inference of racial discrimination.  Such self-serving, unsubstantiated allegations,

without more, cannot defeat OMP's motion for summary judgment.  <u>Bass v. SBC</u>

<u>Communications, Inc.</u>, 418 F.3d 870, 872-73 (8th Cir. 2005).

Graham attempts to prove disparate treatment by demonstrating that she was

treated less favorably than similarly situated employees outside of her protected

group.  Graham describes three situations of disparate treatment by Berkel: (1)

Graham's white Pod members filling out F151 forms incorrectly and not getting

fired; (2) a white OMP employee getting a territory transfer despite company policy

against lateral transfers; and (3) a white OMP employee being allowed to apply for

a hospital representative position when she was not relocatable.

Graham has failed to show that she was similarly situated to any of these

white employees.  In <u>Rodgers v. U.S. Bank, N.A.</u>, 417 F.3d 845, 853 (8th Cir.

2005), the Eighth Circuit clarified that the test at the pretext stage is a rigorous one

for determining whether employees are similarly situated to the plaintiff.  Graham

must show that she and the employees outside of her protected group were similarly

situated in <u>all</u> <u>relevant</u> <u>respects</u>.  <u>Id.</u>  For her first comparison, Graham claims that

white Pod members violated the policy requiring that F151 forms be filled out

completely, and they were not disciplined at all.  Specifically Graham points to her

-17-

Pod partner, Jim Outman. The record contains two incomplete F151 forms

submitted by Outman. One form was missing a state license number and the other

was missing a month, day, and the physician's name and address. When shown

these incomplete forms at his deposition, Outman stated that he could not recall

leaving information missing on any other F151 forms. In contrast, the record

contains at least nine incomplete F151 forms submitted by Graham, and she stated

in her deposition that she routinely left the day blank on these forms. By her own

admission, her practice of submitting incomplete F151 forms was routine. Although

they violated the same company policy, Graham and Outman are not similarly

situated because the frequency and seriousness of Graham's violations, and the

suspicious circumstances surrounding her violations, set her apart. See Rodgers,

417 F.3d at 853.

Graham's second and third comparators are white employees who allegedly

received or applied for territory transfers when company policy did not allow such

transfers. Denise Brys was redeployed to a Missouri territory after a third-party

company realigned the OMP sales territories. Nicole Kassing was allowed to apply

for a hospital representative position that Graham was not allowed to apply for,

even though Kassing was not eligible for relocation. Graham is not similarly

situated to either of these two employees. "[E]mployees are similarly situated only

-18-

when they are involved in or accused of the same offense and are disciplined in different ways." Wheeler, 360 F.3d 853, 858 (8th Cir. 2004) (citing Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994). Graham alleges no offense or misconduct on the part of Brys or Kassing and no more favorable discipline as a result. I fail to see how these allegations, if true, demonstrate that Berkel intentionally discriminated against Graham when she decided to terminate her employment.

Although Graham, as the non-movant on a motion for summary judgment, is entitled to all reasonable inferences from the record, there is no evidence from which a person could infer that intentional discrimination was the true motive behind her termination from OMP. Graham cannot withstand summary judgment by merely hoping, without presenting some evidence of pretext, that the jury might not believe OMP's unchallenged legitimate, nondiscriminatory reasons. Barge v. Anheuser Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996). OMP is free to make any decision it chooses regarding its personnel, so long as it does not impermissibly discriminate. See, e.g., McLaughlin, 50 F.3d at 511-12. Under Title VII, cases must be decided on evidence of racial discrimination, not on the basis of fairness. Torlowei v. Target, 401 F.3d 933, 935 (8th Cir. 2005) (per curiam). This Court does not "sit as a super-personnel [department] reviewing the wisdom or fairness of business

judgments made by employers, except to the extent those judgments involve

intentional discrimination." Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 781

(8th Cir. 1995).  In other words, whether OMP's enforcement of its policies was fair

is irrelevant as long as its stated reasons for Graham's termination were not a front

for an ulterior, racially discriminatory motive.  Accordingly, Graham's claim that her

termination was based on her race fails.

### 2.    Retaliation Claim

Graham's retaliation claim can also be analyzed using the framework of

burden shifting originally developed in McDonnell Douglas Corp. v. Green, 411

U.S. 792 (1973).  Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1119 (8th Cir.

2006).  Under this framework, Graham must first establish a prima facie case of

retaliation by adducing proof that: (1) she took part in protected conduct; (2) she

was subjected to an adverse employment action; and (3) there exists a casual nexus

between the protected conduct and the adverse action.  Id. (citing Hesse v. Avis

Rent A Car Sys., Inc., 394 F.3d 624, 632 (8th Cir. 2005)).  "A minimal evidentiary

showing will satisfy this burden of production." Rodgers, 417 F.3d 845, 850 (8th

Cir. 2005) (quoting Pope v. ESA Serv., Inc., 406 F.3d 1001, 1007 (8th Cir. 2005)).

OMP argues that the two decision-makers were unaware of Graham's

complaint to Carmen Harris and therefore she can not establish a casual nexus

between her complaint and her termination.  Graham counters that a jury may infer

that the decision-makers knew of the complaint from the facts in the record.  I

disagree.

For a casual nexus to exist, the OMP decision-makers must have known of

the statutorily protected activity before they terminated Graham.  Smith v. Riceland

Foods, Inc., 151 F.3d 813, 818 (8th Cir. 1998) (citing Simon v. Simmons Foods,

Inc., 49 F.3d 386, 389 (8th Cir. 1995) (stating that a plaintiff must show that "the

employer had actual or constructive knowledge of the protected conduct" in order to

establish a prima facie case of retaliation);  Wolff v. Berkley, Inc., 938 F.2d 100,

103 (8th Cir. 1991) (stating that a causal link between statutorily protected activity

and an adverse employment action "does not exist if the employer is not aware of

the employee's statutorily protected activity")).

Although the Court must view the facts in the light most favorable to Graham,

that does not mean that the Court will speculate that witnesses are lying.  For

purposes of this motion, I accept as uncontroverted Graham's testimony that she

complained to Carmen Harris of discriminatory treatment by Berkel.  Graham

argues that because Harris was copied on emails between Berkel and Graham,

because Harris could not recall a specific conversation with Graham about

discrimination, and because Harris and Waselefsky worked together on issues

related to St. Louis sales territories, a reasonable jury could infer that the decision-makers, Berkel and Waselefsky, had knowledge of Graham's complaint to Harris. This is pure speculation. Both Berkel and Waselefsky submitted affidavits declaring they were not aware of Graham's complaint. The emails that Harris was copied on did not address the issue of discriminatory treatment; they concerned the final warning that Graham had received and made no mention of discrimination or any earlier complaint. It is unreasonable to assume that two employees who worked together in a large company must have knowledge of the same events. There is simply no evidence to support an inference that the decision-makers knew of Graham's complaint.

Graham has not offered any evidence by which a trier of fact could conclude that there was some casual connection between her complaint to Harris and her termination six months later. Therefore, Graham's retaliation claim fails.

## IV.    Conclusion

Because Graham has failed to provide any evidence of intentional discrimination or establish any casual connection between her complaint and her termination, OMP's motion for summary judgment on all claims will be granted.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motion for summary judgment

[#36] is granted.

**IT IS FURTHER ORDERED** that defendants' motion for leave to file

amended answer [#51] is denied as moot.

A separate judgment in accord with this Memorandum and Order is entered

this same date.

_Catherine D. Perry_
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of June, 2006.

-23-